OPINION
{¶ 1} Defendant-appellant, Michael K. Reinhardt, appeals from a judgment of the Franklin County Court of Common Pleas finding him guilty, following a jury trial, of two counts of rape, two counts of sexual battery and one count of disseminating matter harmful to juveniles. Because the sufficiency and weight of the evidence support defendant's convictions, and because defendant received effective assistance of counsel, we affirm.
 {¶ 2} On November 4, 2002, defendant was charged with three counts of rape in violation of R.C. 2907.02, three counts of sexual battery in violation of R.C. 2907.03, and two counts of disseminating matter harmful to juveniles in violation of R.C.2907.31. Specifically, Counts 1, 4, 7, and 8 of the indictment alleged rape, sexual battery and disseminating matter harmful to juveniles, respectively, from December 1, 1999 to December 31, 1999. Counts 2 and 5 of the indictment alleged rape and sexual battery, respectively, from June 1, 2000 to September 1, 2000. Counts 3 and 6 of the indictment alleged rape and sexual battery, respectively, from June 1, 2001 to June 30, 2001. All three rape counts alleged that defendant purposely compelled the victim to submit by force or threat of force.
 {¶ 3} Defendant's first trial commenced in August 2003 and ended in a mistrial. Defendant was retried in November 2003. The evidence adduced at the second trial is as follows. The victim, N.J.M., born January 14, 1989, lived in a three-bedroom apartment with her mother, Lisa, Lisa's boyfriend (defendant) and her sisters, Amy, Destiny and Leslie. Lisa is the natural mother of all four children; however, defendant fathered only Leslie. Lisa worked from 9:00 a.m. to 9:30 p.m. at a retail clothing establishment. While Lisa worked, defendant stayed home and cared for the children. Defendant kept several pornographic videotapes in the apartment and sometimes watched them with Lisa. Defendant and Lisa shared a bedroom with Leslie; Amy and Destiny shared a bedroom directly across the hallway; and N.J.M. had her own bedroom.
 {¶ 4} N.J.M. testified that as she slept in her bedroom just before Christmas 1999, she "woke up to [defendant's] tongue on [her] vagina." (Tr. 16.) She opened and closed her eyes, but said nothing to defendant. When defendant was "done" he left the room. Id. Sometime after the incident, defendant told N.J.M. that if she informed anyone about what had happened, he would "put [her] six feet underground." Id. According to N.J.M., defendant performed the same act on her at least every other night until about a month before he moved out of the apartment in July 2001. She further testified that about half of the time, defendant would watch pornographic videos while he abused her. During the final episode of abuse, she did not close her eyes and pretend to be asleep as she had previously done; rather, she told defendant to get off of her. Defendant told her to "shut up and turn [her] head." (Tr. 19.) N.J.M. complied with defendant's order.
 {¶ 5} N.J.M. also testified that once when defendant was alone in the apartment with her and three of her teenaged cousins, defendant played a pornographic videotape in their presence. All three of the teenagers corroborated N.J.M.'s testimony and described the videotape as depicting naked adults "having sex." (Tr. 53, 58, 69.)
 {¶ 6} About a week after defendant moved out of the apartment, N.J.M. reported the abuse to Lisa's sister, Kimberly, because she did not want Lisa to resume her relationship with defendant. Kimberly relayed the information to Lisa, who then called the police and took N.J.M. to Children's Hospital for an examination.
 {¶ 7} Gail Hornor, a pediatric nurse practitioner at Children's Hospital, conducted a sexual abuse assessment of N.J.M. on July 18, 2001, based upon the history of oral/genital contact provided by Lisa. Ms. Hornor did not interview N.J.M.; however, she conducted a complete physical examination of N.J.M., including a genital examination. Ms. Hornor testified the genital examination was normal; however, she further averred that a normal genital examination would not necessarily negate the history of sexual abuse N.J.M. disclosed to Lisa.
 {¶ 8} In December 2001, Franklin County Children Services removed all four children from Lisa's care due to her ongoing alcohol and substance abuse problems. N.J.M. eventually went to live with Lisa's mother, Nona; Nona's sister was awarded temporary custody of Leslie.
 {¶ 9} Columbus Police Detective, Melinda Hunt, interviewed N.J.M. on August 8, 2001. Based upon that interview, Detective Hunt sought interviews with several other persons, including defendant; however, defendant's whereabouts were unknown for several months after the allegations surfaced. Defendant returned to Columbus in May 2002 and Detective Hunt interviewed him on June 4, 2002. Defendant denied all the allegations and averred that he was unaware of the pending investigation until he returned to Columbus in May 2002.
 {¶ 10} According to Detective Hunt, defendant offered the names of three witnesses, including his girlfriend, Rhonda, who allegedly had personal knowledge that Lisa and Nona coached N.J.M. concerning what to say during her interview with the police. Defendant also asserted that Rhonda possessed a tape recording of the alleged coaching incident. Detective Hunt testified that she interviewed Rhonda, who confirmed she overheard Nona and Lisa coaching N.J.M.; however, the tape recording was never produced for the police. The other two witnesses were never located. Defendant again denied the allegations during a second interview after his arrest in July 2002.
 {¶ 11} Defendant's girlfriend, Rhonda, Nona's former daughter-in-law, testified on behalf of defendant. According to Rhonda, in July 2001, she overheard several conversations between Lisa, Nona, and N.J.M. involving the allegations of sexual abuse N.J.M. was planning to levy against defendant. According to Rhonda, Nona initially instructed N.J.M. to allege that defendant had vaginal intercourse with her. However, after realizing that such allegations might easily be refuted by a lack of physical evidence, Nona instructed N.J.M. to allege that defendant performed cunnilingus on her. Rhonda admitted that she did not report the alleged conspiracy to the police.
 {¶ 12} Rhonda further testified that she began a live-in relationship with defendant in May 2002 and they had a child together in the summer of 2003. According to Rhonda, N.J.M. visited her home several times after defendant moved in and N.J.M. never seemed afraid of defendant. Rhonda also testified that Nona made several harassing telephone calls to her home in May and June 2002. She further testified that she tape recorded several telephone conversations during which Nona allegedly admitted that she instructed N.J.M. as to the allegations of sexual abuse asserted against defendant. Rhonda maintained that she showed the tapes of the telephone calls to Detective Hunt when defendant was interviewed, but would not permit her to listen to them. At trial, Rhonda averred that the tapes had been misplaced.
 {¶ 13} Misty, a friend of Nona and Lisa's, testified that she lived with Lisa and defendant for approximately one and one-half months. In March 2003, Nona asked Misty if defendant had ever "messed with [her]." (Tr. 217.) Despite Misty's denial, Nona asked her if she would be willing to go to court and testify that he had sexually abused her. Misty told Nona she would not so testify.
 {¶ 14} At the close of the state's case, the trial court dismissed Count 8 of the indictment. Following deliberations, the jury acquitted defendant on Counts 3 and 6 of the indictment. The jury found defendant guilty on Counts 1, 2, 4, 5 and 7 of the indictment. On the two rape counts, the jury further found that the victim was under the age of 13 and that defendant purposely compelled the victim to submit by force or threat of force.
 {¶ 15} By judgment entry filed January 22, 2004, the trial court sentenced defendant to life imprisonment with parole eligibility after ten years on Counts 1 and 2 of the indictment, one year incarceration on Counts 5 and 6 of the indictment, and six months incarceration on Count 7 of the indictment. The court ordered all five sentences to be served concurrently. By separate entry, the trial court adjudicated defendant a sexually oriented offender.
 {¶ 16} Defendant timely appeals the trial court's judgment and asserts 12 assignments of error, as follows:
I. The jury verdict in count one is not supported by the quantity of evidence required by law.
II. The jury verdict in count two is not supported by the quantity of evidence required by law.
III. The jury verdict in count four is not supported by the quantity of evidence required by law.
IV. The jury verdict in count five is not supported by the quantity of evidence required by law.
V. The jury verdict in count one is against the manifest weight of the evidence.
VI. The jury verdict in count two is against the manifest weight of the evidence.
VII. The jury verdict in count four is against the manifest weight of the evidence.
VIII. The jury verdict in count five is against the manifest weight of the evidence.
IX. The jury verdict in count seven is not supported by the quantity of evidence required by law.
X. The defendant was predjudiced [sic] by the ineffective assistance of counsel in failing to properly voir dire a juror that should have been removed for cause.
XI. The defendant was predjudiced [sic] by the ineffective assistance of counsel in not putting a witness on the standa [sic] and subjecting him to direct examination.
XII. The defendant was predjudiced [sic] by the ineffective assistance of counsel in that counsel refused to introduce evidence of motive of the victim when clearly such evidence was available to him.
 {¶ 17} Before addressing defendant's assignments of error, we note that defendant has failed to include in his brief a statement of the case as required by App.R. 16(A)(5). Counsel is hereby reminded of the duty to fully comply with the rules of appellate procedure in future filings.
 {¶ 18} Defendant's first, second, third, fourth and ninth assignments of error challenge his convictions as not supported by sufficient evidence. "Whether the evidence is legally sufficient to sustain a verdict is a question of law." State v.Thompkins (1997), 78 Ohio St.3d 380, 386. In this inquiry, a reviewing court must determine whether the state has met its burden of production at trial. The court is to assess "not whether the state's evidence is to be believed, but whether, if believed, the evidence against the defendant would support a conviction." Id. at 390. (Cook, J., concurring.) Thus, the court, after viewing the evidence in a light most favorable to the prosecution, must conclude whether any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. State v. Smith (1997),80 Ohio St.3d 89, 113, citing State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus.
 {¶ 19} We first consider defendant's sufficiency of the evidence arguments as they pertain to his rape convictions. R.C.2907.02(A)(1)(b) provides in relevant part that "[n]o person shall engage in sexual conduct with another who is not the spouse of the offender * * * when * * * [t]he other person is less than thirteen years of age, whether or not the offender knows the age of the other person." R.C. 2907.02(B) provides in pertinent part, "If the offender under division (A)(1)(b) of this section purposely compels the victim to submit by force or threat of force * * * whoever violates division (A)(1)(b) of this section shall be imprisoned for life." "Sexual conduct" is defined, in pertinent part, as "cunnilingus between persons regardless of sex." R.C. 2907.01(A).
 {¶ 20} Sufficient evidence was elicited on each element of the rape counts to sustain defendant's convictions. Initially, we reject defendant's contention that there was insufficient evidence to prove that the rapes occurred during the time periods specified in the indictment. The precise date and time a rape occurs is not an essential element of the crime. See R.C.2907.02. "Where the exact date and time of an offense are not material elements of a crime [or] essential to the validity of a conviction, the failure to prove such is of no consequence and it is sufficient to prove that the alleged offense occurred at or about the time charged." State v. Madden (1984),15 Ohio App.3d 130, 131. Moreover, "particularly in cases involving sexual misconduct with a child, the precise times and dates of the alleged offense or offenses oftentimes cannot be determined with specificity." State v. Daniel (1994), 97 Ohio App.3d 548, 556. This rule has been established because "[i]n many cases involving child sexual abuse, the victims are children of tender years who are simply unable to remember exact dates and times, particularly where the crimes involve a repeated course of conduct over an extended period of time." State v. Mundy (1994),99 Ohio App.3d 275, 296.
 {¶ 21} The victim in this case was 10, 11 and 12 years old at the time the rapes were committed against her. As such, it was not unreasonable for the jury to believe that she was unable to remember exact dates and times, especially considering that the same conduct occurred over an 18-month period of time. Moreover, N.J.M.'s testimony sufficiently narrowed the time frames to those specified in the indictment. Count 1 of the indictment alleged the sexual conduct occurred between December 1, 1999 and December 31, 1999. N.J.M. testified that the first incident of abuse occurred just before Christmas 1999, which obviously falls within the time specified in the indictment. Count 2 of the indictment alleged the sexual conduct occurred between June 1, 2000 and September 1, 2000. N.J.M. testified that defendant committed the same act upon her at least every other night from the date of the first incident until he moved out in July 2001. This testimony clearly encompasses the time frame set forth in Count 2 of the indictment.
 {¶ 22} In addition, defendant has failed to demonstrate how the lack of more specific dates prejudiced his defense. Defendant did not assert an alibi claiming he was elsewhere during part of the time frame specified in the indictment. Rather, the evidence established a prolonged period of sexual abuse of N.J.M. Under these circumstances, the state's failure to supply specific dates did not prejudice defendant's ability to prepare his defense.
 {¶ 23} We further reject defendant's contention that the prosecution failed to prove beyond a reasonable doubt that defendant purposely compelled N.J.M to submit by force or threat of force. The plain language of R.C. 2907.02(A)(1)(b) permits a conviction for rape of a child under the age of 13 without proof of force. Thus, under R.C. 2907.02(A)(1)(b), force is not an element of the crime of rape. Proof of force under these circumstances is necessary only to support a life sentence. See R.C. 2907.02(B)(2). Nonetheless, an accused may challenge the sufficiency of the prosecution's evidence not only on each element of the crime charged, but also on the sentence-enhancing provisions. State v. Payton (1997), 119 Ohio App.3d 694, 701.
 {¶ 24} R.C. 2901.01(A)(1) defines "force" to mean "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." The requirement ofphysical violence, compulsion or restraint set forth in R.C.2901.01(A)(1) has been relaxed in cases where the victims are young children. In State v. Eskridge (1988), 38 Ohio St.3d 56, a case involving a father accused of raping his four-year-old daughter, the Supreme Court of Ohio held, at paragraph one of the syllabus, that "[t]he force and violence necessary to commit the crime of rape depends upon the age, size and strength of the parties and their relation to each other. With the filial obligation of obedience to a parent, the same degree of force and violence may not be required upon a person of tender years, as would be required were the parties more nearly equal in age, size and strength."
 {¶ 25} The court emphasized several factors in finding force absent explicit threats or displays of force. The court noted that the victim's father removed the victim's panties and laid her on the bed. Further, the court noted the considerable age and size differences in the victim and her father. The court stated, "[f]orce need not be overt and physically brutal, but can be subtle and psychological. As long as it can be shown that the rape victim's will was overcome by fear or duress, the forcible element of rape can be established." Id. at 58-59, quoting Statev. Fowler (1985), 27 Ohio App.3d 149, 154. The court further found significant the relationship between a child and an important authority figure, noting "[t]he youth and vulnerability of children, coupled with the power inherent in a parent's position of authority, creates a unique situation of dominance and control in which explicit threats and displays of force are not necessary to effect the abuser's purpose." Id., citing NorthCarolina v. Etheridge (1987), 319 N.C. 34, 47, 352 S.E.2d 673,681.
 {¶ 26} In State v. Schaim (1992), 65 Ohio St.3d 51, the case relied upon by defendant, the court declined to extendEskridge to a situation in which a father was charged with sexually abusing his adult daughter. However, the court recognized the continuing vitality of Eskridge in cases involving young children:
State v. Eskridge is based solely on the recognition of the amount of control that parents have over their children, particularly young children. Every detail of a child's life is controlled by a parent, and a four-year old child knows that disobedience will be punished, whether by corporal punishment or an alternative form of discipline. Because of the child's dependence on his or her parents, a child of tender years has no real power to resist his or her parent's command, and every command contains an implicit threat of punishment for failure to obey. Under these circumstances, a minimal degree of force will satisfy the elements forcible rape.
Id. at 55.
 {¶ 27} In State v. Dye (1998), 82 Ohio St.3d 323, 329, the Supreme Court of Ohio expanded the holding of Eskridge to cases where the accused is not a parent but is nonetheless in a position of authority over a child victim. In Dye, a nine-year-old boy was raped by a 44-year-old man who occasionally babysat the victim. The court held that "[a] person in a position of authority over a child under thirteen may be convicted of rape of that child with force pursuant to R.C. 2907.02(A)(1)(b) and (B) without evidence of express threat of harm or evidence of significant physical restraint." Id. at syllabus. In so holding, the court found several factors particularly persuasive. There was a large age difference and a clear disparity in size between the victim and the defendant. The defendant threatened that he would no longer be the victim's friend if the victim told anyone about the abuse. The victim feared the defendant might hit him. The court found substantial evidence of psychological force in the position of authority the defendant held over the victim. The defendant was a close friend of the victim's mother and the mother told the victim to obey the defendant. Finally, the defendant told the victim to keep the rapes a secret.
 {¶ 28} Applying Eskridge and Dye to the instant case, this court concludes, viewing the evidence in a light most favorable to the prosecution, that there was sufficient evidence of force to support the jury's finding. Defendant held a position of authority over N.J.M. by virtue of his live-in relationship with her mother, which eventually culminated in the birth of N.J.M.'s half-sister. In addition, defendant was N.J.M.'s sole caretaker while N.J.M.'s mother worked 12-plus hour shifts outside the home. From this evidence, the jury could reasonably infer that defendant, in Lisa's absence, was N.J.M.'s disciplinarian and had the authority to punish her if she disobeyed him. Indeed, when defendant told N.J.M. to "shut up and turn [her] head" when she requested that he stop abusing her, she dutifully obeyed his order. Finally, defendant threatened to kill N.J.M. if she told anyone about the abuse. Given defendant's position of authority, the evidence supported a finding that N.J.M. was compelled by force or threat of force to submit to defendant.
 {¶ 29} We also reject defendant's contention that the evidence at trial was necessarily insufficient because there was no physical or eyewitness evidence to corroborate N.J.M.'s version of the events. There is no requirement, statutory or otherwise, that a rape victim's testimony must be corroborated as a condition precedent to conviction. State v. Sklenar (1991),71 Ohio App.3d 444; State v. Love (1988), 49 Ohio App.3d 88,91. It is well settled that the testimony of a rape victim, if believed, is sufficient to support each element of rape. Statev. Lewis (1990), 70 Ohio App.3d 624, 638. Further, not all rape victims exhibit signs of physical injury. State v. Buskirk
(Sept. 29, 1994), Cuyahoga App. No. 57800. Indeed, the pediatric nurse practitioner who examined N.J.M. testified that N.J.M.'s normal genital examination did not necessarily negate the history of sexual abuse reported by N.J.M.
 {¶ 30} Viewing the evidence presented by the state in a light most favorable to the prosecution, a rational trier of fact could have found all of the elements of rape of a child under 13 proven beyond a reasonable doubt, as well as the sentence-enhancing specification that defendant purposely compelled N.J.M. to submit by force or threat of force.
 {¶ 31} We next consider defendant's sufficiency of the evidence arguments related to his convictions for sexual battery. R.C. 2907.03(A)(5) provides, in relevant part, that "[n]o person shall engage in sexual conduct with another, not the spouse of the offender, when * * * [t]he offender is the other person's natural or adoptive parent, or a stepparent, or guardian, custodian, or person in loco parentis of the other person."
 {¶ 32} The evidence was sufficient on each element of the sexual battery counts to sustain defendant's convictions. The sexual conduct forming the basis of the sexual battery charges is the same as that underlying the rape charges. Thus, for the reasons set forth in our discussion regarding the rape convictions, we reject defendant's contention that the prosecution failed to prove that the sexual conduct underlying the sexual battery charges occurred during the time periods specified in the indictment.
 {¶ 33} Defendant next contends that the prosecution failed to prove that defendant was N.J.M.'s natural or adoptive parent, stepparent, guardian, custodian, or person in loco parentis. It is undisputed that defendant was not N.J.M.'s natural or adoptive parent, stepparent, guardian or custodian. The issue thus resolves to whether the state presented sufficient evidence to support a jury finding that defendant was a person "in loco parentis" of N.J.M.
 {¶ 34} In State v. Noggle (1993), 67 Ohio St.3d 31, the Supreme Court of Ohio defined the phrase "person in loco parentis" as set forth in R.C. 2907.03(A)(5): "The phrase `person in loco parentis' in R.C. 2907.03(A)(5) applies to a person who has assumed the dominant parental role and is relied upon by the child for support." Id. at paragraph one of the syllabus. Defendant contends that no evidence establishes that defendant was the dominant parent or that he provided support for N.J.M. We disagree. That defendant was N.J.M.'s sole caregiver while Lisa worked long hours outside the home manifestly establishes both that defendant was the dominant parent and that he provided support for N.J.M. The fact that Lisa was home in the late evenings does not diminish defendant's role as the dominant parent. Further, the fact that defendant did not work outside the home or otherwise contribute monetarily to the family does not mean that he did not provide support for N.J.M. As noted by the state, "support" of a child is not limited to financial contributions. Defendant supported the children by filling the role of primary caretaker. The classification of "in loco parentis" "applies to the people the child goes home to." Id. at 33. As defendant was the only adult in the home during Lisa's daily extended absences, he fits well within this description.
 {¶ 35} Viewing the evidence presented by the state in a light most favorable to the prosecution, a rational trier of fact could have found all of the elements of sexual battery proven beyond a reasonable doubt, including the element that defendant stood "in loco parentis" of N.J.M.
 {¶ 36} Finally, we consider defendant's sufficiency of the evidence arguments as related to his conviction for disseminating material harmful to juveniles. Defendant was convicted of a misdemeanor count of R.C. 2907.31(A)(1), which provides that "[n]o person, with knowledge of its character or content, shall recklessly do any of the following: * * * [s]ell, deliver, furnish, disseminate, provide, exhibit, rent, or present to a juvenile any material or performance that is * * * harmful to juveniles." R.C. 2907.01(E)(2) provides that "[a]ny material or performance is `harmful to juveniles,' if it is offensive to prevailing standards in the adult community with respect to what is suitable for juveniles, and * * * [i]t contains a display, description, or representation of sexual activity, masturbation, sexual excitement, or nudity[.]"
 {¶ 37} Defendant contends only that the evidence at trial was insufficient to prove that he showed pornographic videotapes to N.J.M. during the time period specified in the indictment. The precise date and time that the harmful material is disseminated to a juvenile is not an essential element of R.C. 2907.31. Accordingly, the prosecution was required to prove only that defendant showed N.J.M. harmful material "at or about the time charged." Madden, supra. Count 7 of the indictment alleged that defendant disseminated harmful material to N.J.M. during the time period from December 1, 1999 to December 31, 1999. As noted previously, N.J.M. testified that defendant began sexually abusing her just before Christmas 1999. She further testified that half of the time, defendant watched pornographic videos while he abused her. This testimony sufficiently narrowed the time frame to that specified in the indictment. Further, the state's failure to supply specific dates did not prejudice defendant's defense, as he failed to assert an alibi defense.
 {¶ 38} Having determined that the record contains sufficient evidence on each of the elements of the crimes for which defendant was convicted, we overrule defendant's first, second, third, fourth and ninth assignments of error.
 {¶ 39} Defendant's fifth, sixth, seventh and eighth assignments of error contend that his convictions for rape and sexual battery are against the manifest weight of the evidence. In essence, defendant contends the jury should not have believed N.J.M.'s testimony and should have believed the testimony tending to support the defense's theory that N.J.M. was ordered by her grandmother to fabricate the allegations against defendant in order to prevent him from seeking custody of Leslie after his relationship with Lisa ended.
 {¶ 40} Unlike a challenge to the sufficiency of the evidence, which attacks the adequacy of the evidence presented, a challenge to the manifest weight of the evidence attacks the credibility of the evidence presented. Thompkins, supra, at 386-387. In a manifest weight challenge, the reviewing court sits as a "thirteenth juror and makes an independent review of the record." Id. at 387. In performing this function, "[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." State v. Martin (1983),20 Ohio App.3d 172,175. Further, "[o]n the trial of a case, either civil or criminal, the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts."State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus. As such, a jury may believe all, part, or none of the testimony of the witnesses who appear before it. State v.Green, Franklin App. No. 03AP-813, 2004-Ohio-3697, at ¶ 24.
 {¶ 41} Without reservation, N.J.M. identified defendant as the perpetrator of the crimes. N.J.M.'s competency to testify was not challenged. There was no indication that she did not have the intellectual capacity to communicate her observations or recollections. She was cross-examined thoroughly and did not waver in any significant manner from her version of the events. The fact that N.J.M. did not report the abuse until after defendant moved out of the apartment in no way diminishes her credibility. Defendant was N.J.M.'s sole caregiver while her mother was at work and he threatened to kill N.J.M. if she told anyone. From this evidence, the jury could reasonably infer that, given N.J.M.'s young age and dependence on defendant, she was too frightened to report the abuse until she felt she was completely safe from any repercussions by defendant.
 {¶ 42} Similarly, the fact that no other testimony corroborated N.J.M.'s testimony did not render N.J.M.'s testimony incredible. As noted previously, the testimony of a person victimized by sexual misconduct need not be corroborated. Further, although Lisa testified that she did not see or hear defendant leave their bedroom during the night and go into N.J.M.'s room, Lisa described herself as a "very heavy sleeper." (Tr. 78.) Thus, the jury could reasonably believe that defendant could have left his bedroom and abused N.J.M. in her bedroom without disturbing Lisa.
 {¶ 43} Defendant further contends that N.J.M.'s testimony is not credible because she was unable to specifically articulate the precise dates that the sexual encounters occurred. However, as previously noted, N.J.M. provided sufficient testimony on when the sexual encounters occurred and was able to describe the details of those sexual encounters subject to appellant's convictions. In short, the jury had the opportunity to hear N.J.M.'s testimony and judge her credibility. The jury apparently believed her testimony, and the record does not provide any obvious reason to doubt her credibility. It was well within the province of the jury to believe or disbelieve any or all of her testimony.
 {¶ 44} In addition, the jury apparently rejected the defense theory, which was asserted in large measure via the testimony of defense witnesses Rhonda and Misty, that N.J.M.'s allegations resulted from a conspiracy against him orchestrated by N.J.M.'s grandmother. As noted, the jury was free to believe all, none or only part of the testimony of any of the witnesses, including those testifying on behalf of defendant. Such determinations are well within the province of the jury and we discern no miscarriage of justice in the decision to reject the defense theory.
 {¶ 45} An appellate court may not substitute its judgment for that of the jury on the issue of witness credibility unless it is manifestly clear the jury lost its way. Martin, supra. Based upon the record before us, we cannot conclude the jury lost its way and created a manifest miscarriage of justice in arriving at its verdicts. To the contrary, the weight of the evidence supports the rape and sexual battery convictions. Accordingly, defendant's fifth, sixth, seventh and eighth assignments of error are overruled.
 {¶ 46} Defendant's tenth, eleventh and twelfth assignments of error contend that he was denied a fair trial due to ineffective assistance of counsel. In Strickland v. Washington (1984),466 U.S. 668, 104 S.Ct. 2052, the United States Supreme Court adopted a two-part test for determining whether counsel's performance was so defective as to require reversal of a conviction. Id. at 687. Initially, the defendant must demonstrate that counsel's performance was deficient. Id. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed a defendant by the Sixth Amendment to the United States Constitution. Id. The defendant must then show that counsel's deficient performance prejudiced his defense. Id. This requires demonstrating that, but for counsel's unprofessional errors, the result of the trial would have been different. Id. at 694.
 {¶ 47} Defendant initially complains counsel was ineffective in failing to challenge for cause a juror who was allegedly a corrections officer at the penal institution where defendant had previously been incarcerated. Defendant alleges that negative encounters with the corrections officer during the time defendant was incarcerated presumptively biased the juror against him such that he did not receive a fair and impartial trial.
 {¶ 48} Significantly, we note that defendant has not provided this court with a transcript of the voir dire proceedings. "The duty to provide a transcript for appellate review falls upon the appellant. This is necessarily so because an appellant bears the burden of showing error by reference to matters in the record. * * * This principle is recognized in App. R. 9(B), which provides, in part, that `* * * the appellant shall in writing order from the reporter a complete transcript or a transcript of such parts of the proceedings not already on file as he deems necessary for inclusion in the records * * *.' When portions of the transcript necessary for resolution of assigned errors are omitted from the record, the reviewing court has nothing to pass upon and thus, as to those assigned of errors, the court has no choice but to presume the validity of the lower court's proceedings, and affirm." Knapp v. Edwards Laboratories (1980),61 Ohio St.2d 197, 199; State v. Wilhelm, Knox App. No. 03-CA-25, 2004-Ohio-5522, at ¶ 16. Without a record of the voir dire, we have no indication that the juror at issue harbored any bias or prejudice against defendant. As such, we cannot conclude that counsel was ineffective in permitting the juror to be seated on the jury panel. See State v. McKinney (1992),80 Ohio App.3d 470, 477.
 {¶ 49} Defendant also claims defense counsel was ineffective in failing to call N.J.M.'s grandmother, Nona, as a witness at trial. Defendant suggests that, had Nona been called as a witness, defense counsel could have successfully established that Nona orchestrated the allegations against defendant. However, no evidence exists to suggest how Nona would have testified or how the jury would have viewed her testimony. It is impossible for a court to determine on a direct appeal from a criminal conviction whether counsel was ineffective in his or her representation where the allegations of ineffectiveness are based on facts outside the record. State v. Gibson (1980), 69 Ohio App.2d 91,95. At this point, a ruling in defendant's favor would be purely speculative.
 {¶ 50} Further, assuming arguendo that we could properly consider defendant's claim, it is unlikely that defendant could establish ineffective assistance of counsel. "Generally, counsel's decision whether to call a witness falls within the rubric of trial strategy and will not be second-guessed by a reviewing court." State v. Hughbanks, 99 Ohio St.3d 365,2003-Ohio-4121, ¶ 82. Failure to call a witness is not ineffective assistance if calling that witness opens the door to unfavorable testimony that counsel might reasonably conclude would likely outweigh the value of any favorable testimony the witness might offer. State v. Reynolds, 148 Ohio App.3d 578,2002-Ohio-3811, at ¶ 74. Nona may well have offered testimony unfavorable to defendant. Moreover, counsel's theory of the case was developed effectively through cross-examination of the prosecution's witnesses and direct examination of the defense witnesses. Indeed, Rhonda testified that Nona discussed the plan to frame defendant in her presence; Misty testified that Nona implored her to falsely testify that defendant had sexually abused her while she lived with the family.
 {¶ 51} Finally, defendant contends that defense counsel was ineffective in failing to introduce evidence regarding a second motivation N.J.M. may have had for asserting the allegations against him. Defendant asserts N.J.M. became upset with defendant after she was exposed to sexually graphic photographs of her mother and defendant and, as a result, may have fabricated the allegations of sexual misconduct with her to keep her mother from resuming her relationship with defendant. As noted previously, this court cannot determine whether counsel was ineffective where the allegation of ineffectiveness is based on facts outside the record. Gibson, supra.
 {¶ 52} Having thoroughly reviewed the record, we conclude that defense counsel's strategy, although unsuccessful, was a legitimate approach to defendant's defense. The record demonstrates that defense counsel represented defendant in a competent manner. Accordingly, defendant's tenth, eleventh, and twelfth assignments of error are overruled.
 {¶ 53} Having overruled all 12 assignments of error, we hereby affirm the judgment of the Franklin County Court of Common Pleas.
Judgment affirmed.
Bowman and Bryant, JJ., concur.